## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**ERICK BIAGIOLI DA SILVA and**       **Case No.**
**MARLENE APARECIDA BIAGIOLI**

       **Petitioners,**

**v.**

**DAYANE VIEIRA**

       **Respondent.**

_____/

## VERIFIED PETITION FOR RETURN OF CHILDREN TO BRAZIL
## AND REQUEST FOR ISSUANCE OF SHOW CAUSE ORDER

**The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980; International Child Abduction Remedies Act, 22 U.S.C. 9001 *et seq*.**

This Verified Petition for Return of the Children to Brazil and for Issuance of Show Cause Order (the "Petition") is filed as a result of the wrongful retention of three children by Respondent Dayane Vieira (the "Mother") in the United States. Petitioners, Erick Biagioli da Silva (the "Father") and Marlene Aparecida Biagioli (the "Grandmother") (collectively, the "Petitioners"), hereby file this Verified Petition seeking return of the children, D.V.B.S., Y.V.B.S., and A.V.B.S., (the "Children") to Brazil. The Petitioners respectfully seek judicial resolution of this Petition within six weeks, as provided for by the Hague Convention. In support of their Petition, Petitioners state as follows:

## INTRODUCTION

1. In February 2019, the Mother of the Children obtained authorization from a Brazilian court to travel for a 10-day vacation with the Children to Orlando, Florida. She and the Children have never returned to Brazil. The Father objected to the Mother's judicial request for

authorization to travel, based on his concerns that the Mother would do exactly what she did, *i.e.*, violate the court order and not return the Children to Brazil. After receiving representations and assurances from the Mother that the Children would return to Brazil, the court dismissed the Father's objections. Although the Mother and the Children had round-trip tickets, the return tickets were never used. Instead, the Mother disobeyed the court order, retained the Children in Orlando, and since March 2019 has cut off all communication between the Children and their paternal Grandmother and Father.

2.      Immediately upon receiving confirmation that the Children did not return to Brazil on the required date, Petitioners initiated domestic legal proceedings in Brazil to bring the Children home to Brazil. Unfortunately, more than eight months passed until Petitioners were advised to file an application under the Hague Convention. Petitioners, Respondent, and the Children are Brazilian citizens and all have resided their entire lives in Brazil. The Mother and the Father divorced in 2014. In 2018, the Mother was given physical custody, while the Father retained parental authority under Brazilian law, which includes the right to decide the domicile of the Children.

3.      The Father has rights of custody under the Hague Convention pursuant to Brazilian law and has continuously exercised them, including appearing in court to oppose the Mother's petitions to travel with the Children to Orlando, Florida, in 2018 and 2019.

4.      The Grandmother has played an integral role in raising the Children since they were born. She has rights of custody with regard to the Children pursuant to a 2017 Brazilian family court order, and she has paid child support for the Children every month since September 9, 2015.

5.    By failing to return the Children to their habitual residence of Brazil, the Mother breached the Father's rights of custody under Brazilian law as well as the Grandmother's rights of custody under a Brazilian family court order.  The Mother's retention of the Children outside of Brazil is, thus, wrongful within the meaning of the Convention, and the Court should order their return forthwith.

## JURISDICTION

6.    This Court has jurisdiction pursuant to 22 U.S.C. § 9003(a) because this case involves the wrongful retention of children under the age of 16 in the United States from their habitual residence in Brazil.  Furthermore, to the best of Petitioners' knowledge and belief, the Children are located in Orlando, Florida, within the Middle District of Florida. 22 U.S.C. § 9003(b).

## HAGUE CONVENTION

7.    This Petition is brought pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, T.I.A.S. No. 11670, 19 I.L.M. 1501 (the "Convention") and its implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, *et seq*. Brazil and the United States have been treaty partners under the Convention since 2003.  The text of the Hague Convention and ICARA can be found in Appendices A and B to the guide for federal judges published by the Federal Judicial Center. Garbolino, James D., *The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges* (Fed. Jud. Ctr., 2nd ed., 2015).[1]

8.    The Hague Convention is an international treaty designed "'to secure the prompt return of children wrongfully removed to or retained in any Contracting State,' and 'to ensure that rights of custody and of access under the law of one Contracting State are effectively

respected in other Contracting States.'" *Abbott v. Abbott*, 130 S. Ct. 1983, 1989 (2010) (quoting Convention, art. 1).

9.      The Hague Convention provides that the removal or retention of a child is wrongful where it is in breach of a person's rights of custody, either jointly or alone, under the law of the country in which the child was habitually residing immediately before the wrongful removal or retention. *See* Convention, art. 3.

10.      Rights of custody may arise (a) by operation of law, or (b) by reason of a judicial or administrative decision, or (c) by reason of an agreement having legal effect under the law of the country of habitual residence. *See* Convention, art. 3.  The Hague Convention expressly allows United States courts to take notice of the laws of other courts regarding custody determinations. *See* Convention, art. 14.

11.      The "central operating feature" of the Convention is a return order. *Abbott*, 130 S. Ct. at 1989.  When presented with a wrongful removal or retention, "the country to which the child has been brought must 'order the return of the child forthwith,'" absent the applicability of certain narrow exceptions to return. *Id*.  A removal or retention is "wrongful" where the child was removed from its habitual residence in violation of "rights of custody." *Id*.  Rights of custody for purposes of the Convention "'include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.'" *Id*. (*quoting* Convention, art. 5(a)).  A return order does not modify pre-removal rights of custody; it simply allows allocation of those rights to be made by the courts of the country of the child's habitual residence. *Id.* (*citing* Convention, art. 19).

12.      The Hague Convention authorizes a federal district court to determine the merits of a claim for wrongful removal or retention of a child; it does not, however, permit the district

---

[1] *See* https://www.fjc.gov/sites/default/files/2015/Hague%20Convention%20Guide.pdf (last accessed, May 9, 2020).

court to consider the merits of any underlying custody dispute. *See Pielage v. McConnell*, 516 F.3d 1282, 1286 (11th Cir. 2008) (*quoting Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004)). Thus, the Father and Grandmother's Petition is to enforce an international treaty and federal law concerning jurisdiction; this is not a child-custody case. Brazil is the country under the Convention that should make custody determinations. *See* Convention, art. 16.

13.     Here, the Court must order the return of the children forthwith if Petitioners establish the following by a preponderance of the evidence: (1) the Children are under the age of 16; (2) Brazil was the Children's country of habitual residence immediately before the Mother brought them to the United States and wrongfully retained them in February 2019; (3) the retention of the Children in the United States is in breach of the Petitioners' rights of custody pursuant to Brazilian authority; and (4) the Petitioners were exercising their rights of custody at the time the Mother wrongfully retained the Children in the United States. *See* Convention, art. 3; *Pielage v. McConnell*, 516 F.3d 1282, 1286 (11th Cir. 2008); *Lops v. Lops*, 140 F.3d 927, 935 (11th Cir. 1998).

14.     Article 11 of the Hague Convention provides that judicial authorities of contracting states "shall act expeditiously in proceedings for the return of children," and the case is considered delayed if more than six weeks pass from the date a petition is filed before a final order. *See* Convention, art. 11.

## FACTS

### A.  Background

15.     Petitioners and Respondent are citizens of Brazil. The Father and Mother were married in February 2010, when the Father was 24 and the Mother was 20. They have three

Children together: D.V.B.S. is 10 years old, Y.V.B.S. is 9 years old, and A.V.B.S. is 8 years old.[2] The Children were born in and are citizens of Brazil. During their marriage, the Father and the Mother lived with the three Children in Brazil. In particular, throughout extensive periods of time, they lived at the house of the Father's mother, Petitioner Marlene Aparecida Biagioli.

16.     After 11 years together, the Mother and Father divorced in 2014. Also in 2014, the Mother reported to the authorities that the Father hit her leg with a piece of luggage that he was trying to load into his car. At the hearing, the Mother presented two witnesses, who testified that they did not witness the incident occur, but the Mother told them what happened afterwards. The only eye witness to the incident testified that the Father did not physically assault the Mother. He was later convicted and sentenced to three months in prison, and his case is currently pending on appeal.

17.     After the divorce, the Mother and the Father were granted shared custody of the Children, who continued to spend extensive periods of time at the home of their paternal Grandmother.

18.     In October 2014, the Father was arrested for stealing a vehicle that was used in a burglary or theft. He remained incarcerated until October 2017.

19.     As a result of the Father's incarceration, the Mother obtained full custody of the Children, and the Grandmother remained in frequent contact with them.

20.     Under Brazilian law, "custody refers to the care of a child in day to day activities, while parental [authority] is a much broader concept, including the right to decide a child's country of habitual residence." **Exhibit 1**, Affidavit from the Brazilian Central Authority Regarding the Right to Decide about the Place of Habitual Residence of a Child in Brazil, dated

---

[2] Pursuant to Fed. R. Civ. P. 5.2(a), the names and birthdates of the Children are omitted in this Verified Petition and redacted from all exhibits.

May 27, 2020 (the "Brazilian Central Authority Affidavit").  Thus, here, although the Father did not have physical custody while incarcerated, he retained his parental authority rights over the Children, that is, custody rights within the meaning of the Hague Convention.  *See also* **Exhibit 2**, Declaration of Patrícia Panisa, Brazilian counsel, ¶ 11.

21.    As a result of the Father's incarceration, on March 13, 2017, the family agreed that the paternal Grandmother would share the role of raising the Children. This agreement, entered between the Grandmother and the Mother was ratified and adopted by a family court in Brazil on April 4, 2017 (the "Co-Living Agreement"). *See* **Exhibit 3**.

22.    Under the Co-Living Agreement, the Grandmother was given rights that effectively allowed her to be significantly involved in the Children's lives, including the right to live with the Children for periods of time, access the Children's school schedule, visit the Children's school, take part in the Children's school meetings, and meet with the Children's counselor.  The Co-Living Agreement includes "the right of parental responsibility (or rights of custody within the meaning of Article 3 of the [Hague Convention]) for the children, which includes the right to decide about any changes in their place of habitual residence."  *See* Exhibit 1, the Brazilian Central Authority Affidavit.

23.    In addition to her responsibility to care for the Children, the Grandmother has paid child support to the Mother to assist with the Children's financial obligations since September 9, 2015.

24.    After the divorce of his parents, D.V.B.S. was placed in counseling and sought treatment for psychological concerns. The Mother and the Grandmother both participated in and supported D.V.B.S.'s treatment.

**B.  Respondent's Requests to Travel to Florida**

25.    In 2017, the Mother requested the Father's consent to travel with the Children to Orlando.  The Father refused to consent because he was afraid the Mother would never return to Brazil with the Children.

26.    Given the Father's parental authority rights under Brazilian law, without his consent, the Mother must seek judicial authorization to travel abroad with the Children.

27.    On July 19, 2017, the Mother filed her first petition in a Brazilian family court, requesting judicial authorization to travel with the Children for a vacation to Florida. She failed to provide return dates of the Children to Brazil.

28.    On August 2, 2017, the Public Prosecutor's Office issued an opinion that the Mother's request to travel with the Children should not be granted before a hearing with the Father to express his objections. The Public Prosecutor's Office recognized that the Father must be given the opportunity to raise factual and legal concerns to oppose the court's authorization for the trip. **Exhibit 4**, Public Prosecutor's Opinion to the Court, dated August 2, 2017. The court agreed and denied authorization for the Mother to travel without hearing the Father.

29.    In February 2018, Petitioner Erick Biagioli, the Father, appeared and objected before the Brazilian Court to the Mother's request for travel.  The main concern and objection he expressed was "he believes that the children may not return to Brazil." **Exhibit 5**, Father's Objections to Mother's Request for Travel Authorization to the Court, dated February 5, 2018. The Father also alleged that the Mother's family, including her two brothers, lived in the U.S. and have businesses outside of Brazil.  *Id.*  He believed that the Mother was "planning to live abroad with the children," because, among other reasons, she had not provided return dates to Brazil.  *Id.*  The Father further alleged that the Mother had changed her residence in São Paulo

four times within a year; therefore, her providing proof of residence in Brazil was meaningless. *Id.*

30.     In response, the Mother expressly represented to the court that she intended to take the Children on a "vacation trip" only, and that the vacation would not interfere with the court-adopted Co-Living Agreement. The Mother provided a list of Brazilian family contacts in support of her representations that the Children were settled in Brazil and included their school reports. She alleged that she had remarried and her new husband, Eduardo de Souza Almeida, owned a business in Brazil which guaranteed her return to Brazil with the Children. *See* **Exhibit 6**, Hearing Transcript, dated April 2, 2018.

31.     In April 2018, over the Father's objection, the Brazilian court *conditionally* granted the Mother's request to travel with the Children, pending proof to the court of purchased round-trip airline tickets to confirm that the Mother planned to return to Brazil with the Children at the conclusion of the vacation.  The Mother did not provide proof of the purchase of round-trip tickets until January 2019.

32.     The Father immediately appealed the court's decision conditionally approving the vacation travel. In August 2018, while the Father's appeal of the conditional travel approval was pending, the Father was arrested for breaking and entering into a dwelling.  During the incident, the Father sustained a gun-shot injury and a police officer shot and killed one of his friends.

33.     Later, the Father was sentenced and will serve three more years in prison for his involvement in the theft and burglary.[3]  Currently, a petition is pending with the Brazilian court for the Father to serve the remainder of his sentence in an open-regime facility.  He frequently

---

[3] The unusual circumstances of the Father's incarceration should not affect the relief requested in the Petition. The Brazilian courts were aware of his criminal history while he opposed the travel restrictions and recognized his parental authority. Despite his criminal history, there is no evidence that demonstrates that he was anything but a

receives visits from his girlfriend and other family members, with whom he has maintained close connections.

34.    While the Father was in custody, the Children continued to live in São Paulo, Brazil, with their Mother and their Grandmother pursuant to the Co-Living Agreement. The Grandmother remained involved in the Children's daily lives.  Since the Children were born, they have had their own room in the Grandmother's home where they still keep their toys and belongings, such as clothes, shoes, school supplies, and games.  The Grandmother regularly picked up the Children from school, cooked for them, helped with their homework, and participated in school activities and events, including birthday celebrations.  She also attended meetings with the Children's teachers and counselors and took the Children to doctors' appointments.  In other words, the Grandmother has had a major role in the upbringing of the Children and was a loving and devoted surrogate parent.  The Father regularly wrote letters to the Children from jail and sent them to their Grandmother, who would deliver and read them to the Children.

35.    In January 2019, the Mother filed proof of her purchase of round-trip airline tickets to travel with the Children to Orlando, Florida.  The travel was to commence on February 12, 2019, and the return to Brazil was ticketed for February 23, 2019.

36.    The Father objected to the dates the Mother proposed because they overlapped with the Children's school term in Brazil.  In other words, the Father contended that, during the dates the  Mother chose, the Children should be attending school and not vacationing in Orlando.

---

loving father to the Children. This Court must determine the existence and exercise of the Father's rights of custody and leave any custody determinations, if disputed, to the court of the Children's habitual residence.

37.    Over the Father's objections, on February 6, 2019, based on the proof of the intention to return the Children to Brazil, the court authorized the Mother to travel with the Children to Orlando between February 12, 2019, and February 23, 2019.

38.    The Mother and the Children traveled to Florida on February 12, 2019 and never returned.

**C.  Wrongful Retention**

39.    On February 23, 2019, the Mother violated the Brazilian court's travel authorization order when she did not return with the Children to Brazil.  The Mother's failure to return the Children was also in violation of the Co-Living Agreement with the Grandmother.

40.    Just three days after the Mother failed to timely return the Children, and despite his incarceration, on February 26 and 28, 2019, the Father filed petitions to inform the court of the Mother's abduction of the Children and request the court to summon the Mother immediately.

41.    On February 28, 2019, the Mother texted the Grandmother and indicated her cell phone reception was poor but that the Children were doing well.  She failed to specify their location.  *See* **Exhibit 7**, Text Messages between Mother and Grandmother, dated February 28, 2019.  A few days later, she texted the Grandmother again to insist the connection was very poor, but again stated the Children were doing well.  *Id.*  A few days later, the Mother sent a five-second video of the Children to the Grandmother saying they were fine.  That was the last time Petitioners heard from the Mother or the Children because the Mother then ceased all communications with the Grandmother and Father.

**D.  Efforts to have the Children Returned**

42.     Upon the Father's petition, the court in Brazil requested that American Airlines confirm that the return tickets to Brazil for February 23, 2019, had not been used.

43.     On April 11, 2019, American Airlines confirmed that the Mother and the Children did not board a return flight.

44.     A few days later, the Grandmother initiated a separate civil proceeding before a family court in Brazil for the Mother's violation of the Co-Living Agreement by wrongfully retaining the Children in the United States.

45.     On April 17, 2019, the family court that had authorized the trip to Orlando ordered the Mother's counsel of record in Brazil to inform the court of the Children's whereabouts.

46.     On April 30, 2019, the Father informed the family court that 1) he had not authorized the Children's travel; 2) he had previously raised his concerns with the court about the Mother's intention not to return the Children to Brazil (but the court authorized vacation travel over his objections); 3) the Children did not return; and 4) he was still waiting to hear from the Mother and/or her lawyers to take the necessary actions to secure the return of the Children to Brazil.

47.     Not until August 29, 2019, did the Mother's Brazilian counsel finally inform the court they were unable to get in contact with the Mother. Shortly after, the Brazilian court closed the case.

48.     A few weeks later, after approximately eight months of filing notices with the Brazilian courts, the Grandmother and the Father's local counsel informed them of the relief afforded under the Hague Convention and were advised they needed to file an application under

the Hague Convention with the Brazilian Central Authority in order to have the Children returned to Brazil.

49.    On December 16, 2019, the Petitioners filed their application for return of the Children with the Central Authority in Brazil for the Hague Convention. On December 30, 2019, the Petitioners' application was transmitted pursuant to the Convention to the U.S. Central Authority, the United States Department of State, Office of Children's Issues. **Exhibit 8**, Hague Convention Application for Return of the Children**.**

50.    On information and belief, the Mother, with the assistance of family members, has wrongfully retained the Children in the Orlando, Florida, area.

51.    The Petitioners are concerned about the health of the Children and the psychological effects this wrongful retention has had on them. Specifically, the Mother's abduction of the Children has deprived D.V.B.S. of his medical treatment that his Grandmother was overseeing in Brazil.

52.    In addition to the psychological effects, the longer the Children are away from Brazil, the longer the Children are being deprived of the opportunity to learn about cultural, moral, and spiritual values of their homeland.

53.    Since the abduction, the Petitioners have had no contact with the Children, except for the WhatsApp messages and the five-second video of the Children the Mother sent to the Grandmother in March 2019.   Since then, the Grandmother and the Father have had no information about their exact whereabouts.

54.    Through an Accurint report, Petitioners have confirmed that the Mother and her new husband are living at 6024 Raleigh St, Apt. 2812, Orlando, Florida 32835.  The Mother and her new husband are also listed as the owners of a 2014 KIA Ex Forte with a Florida tag. This

vehicle is registered with the Florida Department of Motor Vehicles at the Raleigh Street address which further supports the family's presence in the Middle District of Florida.  Alternatively, the Mother and the Children may be located at 2904 Satire St, Kissimmee, Florida 34746, the new business address of the Mother's new husband, Eduardo de Souza Almeida.

55.    Thus, upon information and belief, the Children are currently located in Orlando or Kissimmee, Florida, within the Middle District of Florida.

### COUNT I – WRONGFUL RETENTION
(ON BEHALF OF FATHER)

56.    The Father restates and re-alleges the allegations contained in Paragraphs 15 through 55 as if fully set forth herein.

57.    The Hague Convention applies to cases where a child under the age of sixteen (16) years has been removed or retained from his or her habitual residence in breach of rights of custody of a petitioner, which the petitioner had been exercising at the time of the wrongful retention of the child or would have been exercising but for the wrongful retention.

58.    The minor Children in this matter are under the age of 16.

59.    At the time of the wrongful retention, in February 2019, the habitual residence of the minor Children was Brazil, where the Children had lived their entire lives and were fully involved in all aspects of daily family, academic, and cultural life.

60.    At the time of the Mother's wrongful retention of the Children, the Father had and continues to have rights of custody with respect to the Children under Brazilian law pursuant to Articles 1,631[4] and 1,634[5] of the Brazilian Civil Code, *see* **Exhibit 9**, Translation of Selected

---

[4] Article 1,631 of the Brazilian Civil Code provides that, "Children are subject to parental authority while they are underage."  *See* **Exhibit 9.**
[5] Article 1,634 of the Brazilian Civil Code provides that, "Regardless of their relation with each other, both parents have the responsibility of exercise full family authority over their children, which consists in: I – to direct their

Brazilian Authority, which provides the parental authority to, among other things, grant or deny the Children permission to travel abroad or to change their permanent residence.  *See also* Exhibit 2, Declaration of Patrícia Panisa, Brazilian counsel, ¶ 11; Exhibit 1, Brazilian Central Authority Affidavit.  These rights fall squarely within the meaning of "rights of custody" under the Hague Convention.  *See* Convention, art. 5; *Abbott,* 131 S. Ct. at 1990.  In other words, Brazilian law vests both parents with parental authority over their child until a competent court enters a contrary order.  The Father retained such authority at all times and possesses all parental authority rights recognized under Brazilian law, including the right to determine his Children's permanent residence.  *See Bader v. Kramer*, 484 F.3d 666, 670 (4th Cir. 2007).

61.    Furthermore, under Brazilian law, parental authority (which includes the right to determine the child's residence and to grant or to deny them consent to travel abroad) is not revoked or suspended when the parent loses physical custody of the child.  *See* Exhibit 2, Declaration of Patrícia Panisa, Brazilian counsel, ¶ 7.  *See Garcia v. Pinelo*, 808 F.3d 1158, 1166-67 (2015) (holding that *patria potestad*—the same concept as parental authority under Brazilian law—is not extinguished by a custody agreement under Mexican law).  The Father retained parental authority over the Children even when the Mother obtained unilateral physical custody by court order and such authority has never been suspended or revoked by any court.[6] *See* Exhibit 2, Declaration of Patrícia Panisa, Brazilian counsel, ¶ 10; Exhibit 9, Translation of Selected Brazilian Authority, Section 1,635 of the Brazilian Civil Code and Article 24 of the Child and Adolescent Statute.

---

upbringing and education; . . . IV – to grant or to deny them consent to travel abroad; V – to grant or to deny them consent to change their residence to a different municipality; . . . VIII – reclaim them from those who illegally detain them." *See* **Exhibit 9.**

[6] Under Article 1,635 of the Brazilian Civil Code, parental authority is terminated by (i) the death of the parent; (ii) the child's emancipation; (iii) the child's attainment of age of majority; (iv) adoption; or (v) a court decision. **Exhibit 9**.  None of these circumstances have occurred in this case.

62.    At the time of the Mother's wrongful retention of the Children and despite his incarceration, the Father was exercising his rights of custody within the meaning of Articles 3 and 5 of the Convention, and continued to do so until the Children left Brazil.  He appeared in court to object to the Mother's request to travel with the Children to Orlando and wrote letters to them from jail.

63.    In fact, the Brazilian courts recognized the existence of this right of custody, despite his criminal history, through his opposition of the Children's travel.

64.    The Mother's retention of the Children in the United States is a breach of the Father's right of custody under Brazilian law and is, thus, wrongful.

65.    The Father has never consented or acquiesced to the retention of the Children in the United States.  To the contrary, the Father relentlessly opposed the authorization to travel to the United States and has persistently notified the court of the Mother's wrongful retention of the Children.  In addition, the Father has resolutely pursued the Children's return to Brazil.

66.    The Father has promptly taken all legal steps available to him to seek the return of the Children to Brazil.

67.    As the country of the Children's habitual residence, Brazil must make all custody decisions relating to the Children under the Convention and ICARA.

68.    Thus, the Father is entitled to a return order mandating forthwith the return of the Children to Brazil so that any and all custody determinations can be made by the courts of the Children's habitual residence.

## COUNT II – WRONGFUL RETENTION
### (ON BEHALF OF GRANDMOTHER)

69.    The Grandmother restates and re-alleges the allegations contained in Paragraphs 15 through 55 as if fully set forth herein.

70.     The Convention applies to cases where a child under the age of sixteen (16) years has been removed or retained from his or her habitual residence in breach of rights of custody of a petitioner, which the petitioner had been exercising at the time of the wrongful retention of the child, or would have been exercising but for the wrongful retention.

71.     The minor Children in this matter are under the age of 16.

72.     At the time of the wrongful retention in February 2019, the habitual residence of the minor Children was Brazil, where the Children were fully involved in all aspects of daily family, academic and cultural life.

73.     At the time of the Mother's wrongful retention of the Children, the Grandmother had and continues to have rights of custody with respect to the Children pursuant to the Co-Living Agreement adopted by a Brazilian court.  The terms of this court-entered order are binding on the parties and serve as evidence of rights of custody under the Hague Convention. *See* Exhibit 1, Brazilian Central Authority Affidavit; *see also* Exhibit 2, Declaration of Patrícia Panisa, Brazilian counsel, ¶ 16.  In addition, the Grandmother not only provided for the Children while they frequently lived in her home, she also provided child support to the Mother to assist with the financial obligations of the Children. The payment of child support is a factor the courts will consider to support a petitioner's exercise of their rights of custody.  See *Bader v. Kramer*, 484 F.3d 666, 671 (4th Cir. 2007).  *See also* Exhibit 2, Declaration of Patrícia Panisa, Brazilian counsel, ¶ 16.  At the time of the Mother's wrongful retention of the Children, the Grandmother was actually exercising her rights of custody within the meaning of Articles 3 and 5 of the Convention in that she is the Grandmother of the Children and has exercised parental responsibility rights pursuant to the Co-Living Agreement, in addition to paying child support.

74.     Therefore, the Mother's retention of the Children in the United States is in violation of the Grandmother's rights of custody within the meaning of the Hague Convention pursuant to the Co-Living Agreement, reached between the Grandmother and the Mother of the Children, and adopted by a Brazilian court.  *See* Exhibit 1, Brazilian Central Authority Affidavit.

75.     The Grandmother has never consented or acquiesced to the retention of the Children in the United States.

76.     The Grandmother has promptly taken all legal steps available to her to seek the return of the Children to Brazil.

77.     The Brazilian courts, the Mother, and the Grandmother agreed that the Co-Living Arrangement was the best solution for the Children while the Father serves his sentence.

78.     If the Mother changed her mind concerning the Children's living or custody arrangements, she should have filed a petition and sought such relief from the appropriate Brazilian court.

79.     Instead of seeking the appropriate remedy, the Mother misled the Brazilian courts as to the purpose of the travel, disobeyed the court-ordered travel restrictions, blatantly ignored the court's directive to return the Children on February 23, 2019, and conspicuously disregarded the family's agreement, adopted by a Brazilian court, regarding the Children's raising adopted in the Co-Living Agreement.

80.     Thus, the Grandmother is entitled to a return order that mandates the return of the Children to Brazil.  In the event that a dispute arises involving the custody of the Children, that return order would also allow for the allocation of the rights of custody to be made by the courts of the country of the Children's habitual residence—Brazil.

## PROVISIONAL AND EMERGENCY REMEDIES

81.     Pursuant to ICARA, 22 U.S.C. § 9004, in a proceeding for the return of a child, "[n]o court exercising jurisdiction . . . may.  . . order a child removed from a person having physical control of the Child unless the applicable requirements of State law are satisfied." ICARA § 9004(b).  In this case, the State law referred to is that of Florida.  In Florida, the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") is the source for state statutory law governing, among other things, the resolution of both domestic and international child custody disputes and is codified as Fla. Stat. § 61.501 *et seq*.  Florida law addresses the appearance of the parties and the Child in such cases in § 61.523 of the UCCJEA.  That section authorizes this Court to order the appearance of the Child and custodian or custodians together. This Court, therefore, has the authority to issue a show cause order, ordering the appearance of the Respondent and Children to ensure that the provisions of 22 U.S.C. § 9004 are met.

82.     The Petitioners further request that this Court issue, along with the Show Cause Order, a) an Order prohibiting the removal of the Children from the jurisdiction of this Court during the pendency of the proceedings in this Court; b) an Order taking into safe-keeping all of the Children's travel documents; and c) an Order setting an expedited hearing on the Verified Petition for Return of the Children to Brazil.

## UCCJEA DECLARATION

83.     The details regarding the minor Children that are required to be provided under the UCCJEA are as follows:

84.     Since February 2019, upon information and belief, the Children have been physically located with the Mother, as a result of the wrongful retention of the Children, at 6024 Raleigh Street, Apartment 2812, Orlando, FL 32835-2247.

85.    Alternatively, the Mother and the Children may be located at 2904 Satire St, Kissimmee, FL 34746.

86.    The Grandmother commenced domestic proceedings in August 2019, filing a claim for breach of the Co-Living Agreement with a family court in São Paulo, Brazil (case no. 0002094-33.2019.8.26.0008).

87.    The Petitioners filed an application for return of the Children under the Hague Convention on December 16, 2019.

88.    The Petitioners do not know of any person or institution not a party to the proceedings who has physical custody of the Children or claims to have rights of parental responsibility or legal custody or physical custody of, or visitation or parenting time with, the Children.

## NOTICE OF HEARING

89.    Pursuant to ICARA § 9003(c), the Mother will be given notice of any hearings in accordance with §§ 61.509, 61.518 of the UCCJEA.

## ATTORNEYS' FEES AND COSTS INCLUDING TRANSPORTATION EXPENSES PURSUANT TO CONVENTION ARTICLE 26 AND ICARA § 9007

90.    The Petitioners have incurred substantial expenses as a result of the wrongful retention of the Children by the Mother.

91.    The Petitioners respectfully request that this Court award all legal costs, fees, and other expenses the Petitioners have incurred and will incur to obtain the Children's safe return to Brazil pursuant to Article 26 of the Convention and ICARA § 9007 to the Petitioners.

## RELIEF REQUESTED

**WHEREFORE**, Petitioners, Erick Biagioli da Silva and Marlene Aparecida Biagioli, respectfully request the following relief:

    a.  That this Court issue a Show Cause Order directing the United States Marshals Service or other federal officer to serve this Petition and the below-described show cause order on Dayane Vieira, and ordering her to appear in this Court to show cause why the Children should not be returned to Brazil forthwith for the Brazilian courts to make any and all custody determinations;

    b.  That this Court prohibit the removal of the Children from the jurisdiction of this Court pending the resolution of this Petition and taking into safe-keeping the Children's passport and travel documents;

    c.  That this Court set an expedited final evidentiary hearing on this Verified Petition for Return of Children to Brazil and Request for Issuance of Show Cause Order;

    d.  That, following the final evidentiary hearing, this Court issue an Order directing the prompt return of the Children to their habitual residence of Brazil for the Brazilian courts to make any and all custody determinations in accordance with Articles 3 and 5 of the Convention;

    e.  That this Court issue an Order directing Dayane Vieira to pay the Petitioners' reasonable legal costs, fees, and expenses of effectuating the Children's return to Brazil; and

That this Court grant any such further relief as justice and the Petitioners' cause may require.

## **VERIFICATION**

I, Erick Biagioli da Silva, do solemnly declare and affirm under the penalties of perjury under the laws of the United States of America that I have reviewed a Portuguese translation of the factual averments of this Verified Petition for Return of Children to Brazil (¶¶15-55 *above*) and they are true and correct.

Erick Biagioli da Silva

Executed on this 7th day of July, 2020.

## **VERIFICATION**

I, Marlene Aparecida Biagioli, do solemnly declare and affirm under the penalties of perjury under the laws of the United States of America that I have reviewed a Portuguese translation of the factual averments of this Verified Petition for Return of Children to Brazil (¶¶15-55 *above*) and they are true and correct.

Marlene Aparecida Biagioli

Executed on this 7th day of July, 2020.

**HOLLAND & KNIGHT LLP**


/s/ Brian A. Briz
Brian A. Briz
*Trial Counsel*
Fla. Bar No. 657557

/s/ Katharine Menéndez
Katharine Menéndez de la Cuesta
Fla. Bar No. 125433

Brett Alan Barfield
Fla. Bar No. 192252
Sydney Alexander
Fla. Bar No. 1019569
701 Brickell Ave., Suite 3300
Miami, FL 33101-5441
Tel. 305-374-8500
Fax. 305-789-7799
brian.briz@hklaw.com
katharine.menendez@hklaw.com
brett.barfield@hklaw.com
sydney.alexander@hklaw.com


*Attorneys for Petitioners*


#74464561_v15