UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ERICK BIAGIOLI DA SILVA; and
MARLENE APARECIDA BIAGIOLI,

  Petitioners,

v.  Case No. 6:20-cv-1301-Orl-37GJK

DAYANE VIEIRA,

  Respondent.

## **MEMORANDUM OPINION AND ORDER**

Before the Court is Petitioners' verified petition for the return of children to Brazil. (Doc. 1 ("**Petition**").) Respondent opposes. (Doc. 20.) The Court conducted a multi-day evidentiary hearing from August 25, 2020 to August 28, 2020 (Docs. 29–30, 33 (collectively, "**Hearing**")), and the parties filed closing briefs (Docs. 40–41). On review, the Court grants the Petition and orders the children returned to Brazil.

### I.   HAGUE CONVENTION[1]

The Hague Convention was adopted in 1980 "to address the problem of international child abductions during domestic disputes." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 4 (2014) (cleaned up). Congress implemented the Convention's terms through the International Child Abduction Remedies Act of 1988 ("**ICARA**"). *Gomez v. Fuenmayor*, 812 F.3d 1005, 1010 (11th Cir. 2016). The Convention's "central operating feature is the

---

[1] Any reference to "Convention" in this Order refers to the Hague Convention.

return of the child." *Lozano*, 572 U.S. at 5 (cleaned up). It "empower[s] courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." *Gomez*, 812 F.3d at 1011 (quoting 22 U.S.C. § 9001(b)(4)).The Convention and ICARA are "intend[ed] to restore the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic court for custody hearings." *Hanley v. Roy*, 485 F.3d 641, 644 (11th Cir. 2007) (citations omitted).

## II.    FINDINGS OF FACTS[2]

Petitioners and Respondent are citizens of Brazil. (Doc. 35, pp. 32:22–23, 75:6–10, 108:24–109:1; *see also* Doc. 1, ¶ 15.) Petitioner Erick Biagioli Da Silva ("**Father**") is the father; Petitioner Marlene Aparecida Biagioli ("**Grandmother**") is the children's paternal grandmother; and Respondent Dayane Vieira ("**Mother**") is the children's mother. (*See* Doc. 1.)

The Father and Mother married in February 2010. (Doc. 1, ¶ 15.) They have three children together (collectively, "**Children**"):

- D.V.B.S. (10 years old)
- Y.V.B.S. (9 years old)
- A.V.B.S. (8 years old)

(*Id.*) The Children were born in and are citizens of Brazil. (Doc. 35, p. 38:8–12.) The parents divorced in 2014, first sharing custody of the Children. (*Id.* at 109:13–18; Doc. 1, ¶ 17.)

That year, the Mother accused the Father of domestic violence, testifying in

---

[2] To the extent that any of these facts may represent conclusions of law, the Court adopts them as such.

Brazilian court that during a custody exchange the two had gotten into a verbal argument and the Father kicked the Mother in the leg.[3] (Doc. 42-20; Doc. 42-28, pp. 3–4.) The Father was convicted of assault and eventually sentenced to three months' imprisonment. (Docs. 42-20, 42-28; *see also* Doc. 1, ¶ 16.) Then, in October 2014, the Father was arrested for stealing a vehicle used in a burglary or theft. (Doc. 1, ¶ 18; *see also* Doc. 35, p. 54:13–14.) He served three years in prison and was released in 2017. (Doc. 35, pp. 48:17–19, 54:16.) During his incarceration, the Mother obtained full physical custody of the Children—but the Father's parental rights were never terminated. (*Id.* at 44:21–23, 61:20–62:1, 116:25–117:1; *see also* Doc. 42-27, ¶ 2.) And the Children continued to spend a great deal of time with the Grandmother, who acted as the Father's representative while he was incarcerated. (Doc. 35, pp. 55:16–22, 67:17–19.)

The Mother and Grandmother formalized this arrangement by entering into a signed agreement ("**Agreement**"), adopted and ratified by a Brazilian family court in March 2017.[4] (Doc. 1, ¶ 21; Doc. 35, p. 84:3–9; Doc. 42-3.) The Agreement provided the Children would spend every other weekend and some holidays with the Grandmother—and she had the right to see the Children's school schedule and to participate in school meetings and counseling sessions. (Doc. 42-3; *see also* Doc. 35, pp. 85:19–86:16.) She also

---

[3] The Father swore he only kicked one of the Children's suitcases. (Doc. 42-28, p. 3.) The parties also dispute whether one of the Children witnessed the incident; the Brazilian court summary of the testimony is ambiguous on this question. (*See* Docs. 42-20, 42-28; Doc. 35, p. 110:20–23.)

[4] According to the Grandmother, the two entered into the formal Agreement after the Mother began impeding access to the Children upon the Father's incarceration and the Grandmother threatened legal action. (Doc. 35, p. 84:3–9.)

paid child support. (Doc. 35, p. 91:6–11; *see also* Docs. 42-10, 42-11.) But the Agreement states the Children "shall remain under the exclusive guardianship of the [M]other." (Doc. 42-3, p. 1.)

In December 2017, the Mother served the Father with a petition requesting the Father's consent to travel with the Children outside of Brazil to Orlando, Florida, where she has family.[5] (Doc. 1, ¶ 25; Doc. 35, p. 42:1–4; *see also* Doc. 42-5.) The Father refused, fearing she wouldn't return and he wouldn't see his Children again. (Doc. 35, pp. 42:7–18; *see also* Doc. 42-5.) The Brazilian court held a hearing on the Mother's request. (Doc. 42-6.) At the hearing, the Father argued her stated intentions (a short vacation) were pretext and she was planning to take the Children and not come back. (Doc. 35, p. 42:21–24; *see also* Doc. 42-5.) The Mother said it was a vacation trip, testifying her current partner had a business in Brazil, she didn't have dual citizenship, and her and the Children had tourist visas. (Doc. 42-6, p. 1; Doc. 42-16; *see also* Doc. 1, ¶ 30.) With no hard evidence of the Mother's intentions, and given the Mother's and the Children's connections to Brazil, the court authorized travel. (Docs. 42-6, 42-16; *see also* Doc. 1, ¶ 30.) But it required the Mother file proof of return tickets before she could leave. (Doc. 42-16, p. 4.) The Mother complied and filed tickets, booking departure on February 12, 2019 and a return on February 22, 2019. (Doc. 42-17.)

---

[5] The Father mistakenly testifies he was notified in 2018; the Brazilian court records show he was served with the Mother's petition for travel authorization on December 12, 2017 but he did not respond to the petition until February 2018. (*See* Doc. 35, p. 42:1–4; Doc. 42-5, p. 1.)

The Father appealed the travel decision. (*See* Docs. 42-18, 42-19.) While the appeal was pending, he was shot while breaking and entering into a dwelling. (Doc. 1, ¶ 32; Doc. 35, pp. 54:17–55:9.) The Father was convicted for theft and burglary; he has served about two years in prison and is eligible for release from custody in about three months for good behavior. (Doc. 35, pp. 35:24–36:2, 48:15–16, 52:12–14, 54:17–20.) While incarcerated, the Father continued to write his Children letters and the Children kept visiting the Grandmother under the Agreement. (Doc. 35, pp. 49:11–14, 85:17–86:4, 94:19–24.)

On January 31, 2019, the Brazilian appeals court affirmed the travel decision, overruling the Father's objections. (Docs. 42-18, 42-19.) The Mother and Children left Brazil on February 12, 2019 to travel to the U.S., but never returned. (Doc. 35, pp. 43:20–44:10, 92:5–10; *see also* Doc. 1, ¶ 38.)

In late February the Mother texted the Grandmother to tell her the Children were doing well—but after a few short exchanges, the Mother cut off all contact. (Doc. 42-7; Doc. 35, pp. 91:18–92:10; *see also* Doc. 1, ¶ 41.) After learning the Children had not returned as scheduled, the Father began legal proceedings in Brazil. (Doc. 35, pp. 43:20–44:2; Docs. 42-24, 42-25.) He tried reaching out to the Mother—even getting the Mother's attorneys to reach out too, but there was no response. (Doc. 35, p. 44:5–10; Docs. 42-24, 42-25.) After about 8 months of filing notices with Brazilian courts, during which time they confirmed the Children never returned to Brazil, Petitioners learned they would need to pursue relief under the Hague Convention. (Doc. 35, pp. 44:9–20, 93:11–18; *see also* Doc. 1, ¶ 48.) So the Father and Grandmother filed a Hague application on December

16, 2019, and on December 30, 2019 it was transmitted to the U.S. Department of State. (Doc. 1, ¶ 49.) The Father and Grandmother then filed a Hague petition, here, on July 22, 2020 seeking a court order for the return of the Children to Brazil. (Doc. 1.)

As to the Mother and Children: upon coming to the U.S. in February 2019, the Mother, her husband, and the Children stayed with the Mother's family before moving into a condominium with a long-term lease. (Doc. 39, pp. 17:20–22, 23:11–21; Doc. 43-42.) Last year, the Children were attending school in Orange County; this year the Children are attending a new school, Mater Palms Academy. (Doc. 24, pp. 5:6–13; Doc. 39, pp. 18:18–19:3; Doc. 43-44.)

After receiving the Hague petition, the Court held a show cause hearing and enjoined the Children from traveling out of the Court's jurisdiction. (*See* Docs. 3, 15.) The Court later held the evidentiary Hearing. (Docs. 29, 30, 33.) With briefing complete, the matter is ripe. (Docs. 1, 20, 40–43.)

### III.   CONCLUSIONS OF LAW[6]

To determine whether return is appropriate, the Court must answer three questions: (1) did Petitioners establish by a preponderance of the evidence a prima facie case for the Children's return?; (2) did the Mother establish any affirmative defenses?; and (3) if the Mother established an affirmative defense, should the Court in its discretion still order the return of the Children to Brazil? *See Mendez Lynch v. Mendez Lynch*, 220 F.

---

[6] Hague Convention conclusions often present a mixed question of law and fact. *See, e.g. Baran v. Beaty*, 526 F.3d 1340, 1345 (11th Cir. 2008). To the extent these conclusions represent a finding of fact, the Court adopts it as such.

Supp. 2d 1347, 1357 (M.D. Fla. 2002). Let's begin.

### A. Prima Facie Case

To establish a prima facie case, Petitioners must show, by a preponderance of the evidence: (1) the Children were habitual residents of Brazil immediately before their retention in the U.S.; (2) the Respondent's retention violated Petitioners' custody rights under Brazilian law; and (3) Petitioners had been exercising their custody rights at the time of wrongful retention.[7] *See Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1358 (11th Cir. 2020); *see also* 22 U.S.C. § 9003(e)(1). The Mother does not contest the Children were habitual residents of Brazil but argues the Petitioners didn't have rights of custody and hadn't been exercising those rights at the time of removal. (Doc. 40, ¶ 5; *see also* Doc. 35, p. 38:8–17; Docs. 43-3 to 43-5.) The existence of custody rights is "determined by the law of the country in which the [Children] habitually reside[d] at the time of removal." *Hanley*, 485 F.3d at 645. Let's take each Petitioner.

The Grandmother first. The Grandmother asserts she has rights of custody over the Children "by reason of a judicial . . . decision, or by reason of an agreement having legal effect." (Doc. 41, p. 8 (citing Convention, art. 3).) She argues the Agreement gives her custody rights because it entitled her to take the Children to and from school, have them stay with her for around ten days a month plus certain holidays, to take part in

---

[7] It is uncontested the threshold requirements of the Hague Convention are met: whether the Children are under 16 years of age and both Brazil and the U.S. were signatories to the Hague Convention at the time of removal. (Doc. 35, p. 8:3–13); *Mendez Lynch*, 220 F. Supp. 2d at 1358; Convention, art. 4.

collective school meetings, and to get to know the Children's counselor. (*Id.* at 9–12; *see also* Doc. 42-3.) The Grandmother testified she made child support payments and, as a practical matter, was co-responsible with the Mother in "all the important areas of the Children's development and growth, including participating in school meetings, making decisions related to the Children's education and psychological care, and taking the Children to doctor appointments." (Doc. 41, p. 10; *see also* Doc. 35, pp. 85:17–86:16, 90:11–91:15.) The Mother responds the Agreement gave the Grandmother only "rights of access" under the Hague Convention, not rights of custody. (Doc. 40, ¶¶ 5, 15.) The Mother has the better argument.

The Convention differentiates between "rights of custody" and "rights of access." *Furnes v. Reeves*, 362 F.3d 702, 711 (11th Cir. 2004) (quoting Convention, art. 5), abrogated on other grounds by *Lozano*, 572 U.S. 1. Under the Convention, rights of custody "shall include *rights relating to the care of the person of the child* and, in particular, the *right to determine the child's place of residence.*" *Id.* (quoting Convention, art. 5(a)) (emphasis added by *Furnes*). On the other hand, rights of access "shall include the right to take a child for a limited period of time to a place other than the child's habitual residence." *Id.* (quoting Convention, art. 5(b)). Only a party with a custody right can seek the return remedy. *Id.* at 712, 712 n.9. When deciding whether a party has custody rights, courts must look to the Convention's definition and "not allow our somewhat different American concepts of custody to cloud our application of the Convention's terms." *Id.* That is, courts must not place undue emphasis on the right to physical custody of the Children and instead

must look to whether the party asserting a custody right had decision-making authority over important decisions relating to the care of the child. *Id.*; *Hanley*, 485 F.3d at 646–648; *see also* Convention, art. 5.

The Grandmother fails to show, by a preponderance of the evidence, she has rights of custody as defined by the Hague Convention. While she is no doubt an important person in the Children's lives and she assisted in their care, nothing about the Agreement or her daily actions suggest she had any *decision-making* rights relating to their care. (*See* Doc. 35, pp. 85:17–86:16, 90:11–91:15.) To the contrary, the Agreement explicitly reserves to the Mother "exclusive guardianship." (Doc. 42-3, p. 1.) And while not dispositive it is significant the Mother did not have to obtain the Grandmother's permission to take the Children to the U.S. (Doc. 37, pp. 23:25–24:11.) Even the Petitioners' own expert on Brazilian law, Patricia Panisa, could not testify to any specific decision-making rights the Grandmother had over the Children, saying only the Agreement gave the Grandmother "residual rights" and allowed her "to *participate* actively in the [Children's] daily life and affairs." (Doc. 37, p. 23:13–17 (emphasis added); *see also* Doc. 1-3.) Ms. Panisa conceded that the Agreement "in no way . . . granted her parental authority over the [C]hildren." (Doc. 37, p. 23:18–21.) So Petitioners did not meet their burden to show the Grandmother had rights of custody under the Hague Convention.[8] *See Takeshi Ogawa v. Kyong Kang*, 946 F.3d 1176, 1179–1182 (10th Cir. 2020); *cf. Hanley*, 485 F.3d at 646–648; *see also* Convention,

---

[8] The Grandmother had rights of access, but as Petitioners are seeking the return remedy these rights do not apply here. *See Furnes*, 362 F.3d at 712 n.9.

art. 5.

But Petitioners are ultimately successful because the Father has custody rights under the Hague Convention. While the Father, at least temporarily, lost physical custody of the Children because of his incarceration, he retained a *ne exeat* right as their father under Brazilian law. (*See* Doc. 35, pp. 40:18–22, 117:9–13; *See also* Docs. 42-5, 42-6, 42-9, 42-16, 42-18, 42-19, 42-27.) A *ne exeat* right is "the authority to consent before the other parent may take the child to another country." *Abbott v. Abbott*, 560 U.S. 1, 5 (2010). The Father exercised his *ne exeat* right when he refused to consent to the "vacation trip" to Orlando—forcing the Mother to obtain travel authorization from a Brazilian court to overrule the Father's objection. (*See* Docs. 42-5, 42-16.) And the court did so—but only because it was satisfied the Mother would return to Brazil, even requiring proof of return tickets. (Doc. 42-16, p. 4.) The Brazilian appeals court, too, recognized the Father's right to object to the Mother's travel with the Children. (Doc. 42-18.) And Ms. Panisa credibly testified that despite the Father's incarceration, his parental authority was not suspended and he will maintain his rights, including his *ne exeat* right, unless the Mother successfully petitions to end his parental authority. (Doc. 37, p. 15:7–10; *see also* Doc. 42-9; Doc. 1-3, ¶¶ 7–11.) So the Father has shown by a preponderance of the evidence he has a *ne exeat* right and that he was exercising this right at the time of removal.

The Mother argues the Father's *ne exeat* right "standing alone do[es] not amount to custodial rights within the meaning of the Hague Convention." (Doc. 40, ¶ 5.) But the explicit and unequivocal holding in *Abbott* directly contradicts this argument: "a parent

possessing a *ne exeat* right has a right of custody and may seek a return remedy" under the Hague Convention. 560 U.S. at 22. So the Father has established a prima facie case and the Court turns to whether the Mother shows any affirmative defenses. *See id.*

### B. Affirmative Defenses

"[T]he Convention reflects a design to discourage child abduction. But the Convention does not pursue that goal at any cost." *Lozano*, 572 U.S. at 16. To that end, the Convention includes exceptions where the return remedy may not be appropriate even if a prima facie case is established. *Id.*; *see also* Convention, arts. 12, 13, 20; *Mendez Lynch*, 220 F. Supp. 2d at 1357. Exceptions must be applied narrowly. *See* 22 U.S.C. § 9001(a)(4). Let's look at each.

#### 1. Well-Settled

Under Article 12, if a Hague petition is filed more than one year after the child was wrongfully removed, a Court need not order his or her return if "it is demonstrated that the child is now settled in its new environment." The Mother must show this exception applies by a preponderance of the evidence. *See Fernandez v. Bailey*, 909 F.3d 353, 361 (11th Cir. 2018). Both parties agree the Children have been in the U.S. for over a year before the Petition was filed—but are the Children settled? (Doc. 40, ¶ 53; Doc. 41, pp. 15–18.)

Well-settled means more than having a comfortable material existence. *Lops v. Lops*, 140 F.3d 927, 947 (11th Cir. 1998). In determining whether the Children are settled, the Court considers the totality of the circumstances. *Fernandez*, 909 F.3d at 360. A child is settled when "the child has significant connections to their new home that indicate that

the child has developed a stable, permanent, and nontransitory life in their new country to such a degree that return would be to the child's detriment." *Id.* But "disruption should not be considered *per se* detrimental." *Id.* Factors courts consider when determining whether a child is settled include:

> the child's age; the stability and duration of the child's residence in the new environment; whether the child attends school consistently; the stability of the retaining parent's employment and financial circumstances; whether the child has friends and relatives in the new area; whether the child participates in community or extracurricular school activities; the child's immigration status; the respondent's immigration status; whether the child has been concealed in his new location; and the reasons for any delay in initiating the petition for the child's return.

*De La Riva v. Soto*, 183 F. Supp. 3d 1182, 1200 (M.D. Fla. 2016) (citation omitted); *see also Fuentes-Rangel v. Woodman*, 617 F. App'x 920, 922 (11th Cir. 2015).

Under a totality of the circumstances, the Mother has not shown the Children are well settled. While she has shown their living situation is comfortable and the Children are involved with their church, the Children have only been here for a year and a half, and in that time they have changed schools and residences. (Doc. 24, pp. 5:6–13; Doc. 39, pp. 18:18–19:3, 23:11–21; Docs. 43-28, 43-40, 43-41.) The Mother purposefully cut off all contact with the Grandmother and the Father's family back in Brazil.[9] (Doc. 35, pp. 91:19–92:10; Doc. 42-7; *see also* Doc. 1, ¶ 41.) And weighing heavily against a finding of settlement is the Children's immigration status. *See Lopez v. Alcala*, 547 F. Supp. 2d 1255,

---

[9] The Mother's attempts to blame the lack of communication on the Grandmother is unconvincing, given the record evidence and the Brazilian court's failed attempts to establish contact with the Mother. (*See* Docs. 42-7, 42-24, 42-25; *cf.* Doc. 39, 36:2–22.)

1260, 1260 n.6 (M.D. Fla. 2008). They have overstayed their tourist visas and while they have applied for asylum, their applications have not been approved nor is there any indication their applications are meritorious.[10] (Docs. 43-23 to 43-25, 43-33 to 43-37.) Being subject to removal at any time contradicts being "settled" no matter how pleasant their current living situation. Given the Mother's efforts to prevent the Children's contact with their Brazilian family, the change of schools and residences, and, particularly, the Children's uncertain immigration status, the Mother has not met her burden of showing the Children are settled in the U.S. *See Lopez*, 547 F. Supp. at 1260, 1260 n.6; *see also In re Ahumada Cabrera*, 323 F. Supp. 2d 1303, 1314 (S.D. Fla. 2004).

### 2.    Grave Risk of Harm

The Mother also argues the Children face a grave risk of both physical and psychological harm if returned to Brazil. (Doc. 40, ¶¶ 62–68.) Under Article 13(b) of the Convention, a court is not bound to order the return of a child if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13(b). The Mother must show this defense applies by "clear and convincing evidence." *Gomez*, 812 F.3d at 1010. The standard for this exception is high: "to invoke the defense, the party seeking to establish the exception must show that the risk to the child is grave, not merely serious." *Id.* at 1012

---

[10] Presciently, the Brazilian appeals court noted that in granting the Mother's travel authorization, they were persuaded she would return because she was traveling to "a country that famously does not have much tolerance for illegal immigrants." (Doc. 42-18, p. 7.)

(quotation marks and citation omitted).

The Mother argues the evidence establishes "the Father has a long history of involvement in violent crimes, including domestic violence against the Mother in the presence of the Children." (Doc. 40, ¶ 62.) The Court disagrees. While the Father's criminal history is far from spotless, the proper inquiry "focuses on the risk faced by the child, not the parent." *Gomez*, 812 F.3d at 1010. And nothing in the Father's past shows the Children would be at risk. His convictions for stealing a vehicle in 2014 and his 2018 conviction for theft and burglary took place away from the Children and the home and do not implicate their safety. (*See* Doc. 35, p. 54:13–20; *see also* Doc. 1, ¶¶ 18, 32–33.) As to his conviction for kicking the Mother: without minimizing the significance of domestic violence, this single conviction does not support a finding *the Children* face a grave risk of future harm. (*See* Docs. 42-20, 42-28; Doc. 1, ¶ 16.) The Mother testified to the Brazilian court that the Father never physically assaulted her before this incident—and there is no evidence the Children were ever assaulted or threatened by the Father. (*See* Docs. 42-20, p. 4; Doc. 42-28, p. 4.) While "sufficiently serious threats and violence directed against a parent" can pose a grave risk of harm to the Children under the Hague Convention, this single instance of assault against the Mother does not meet this heavy burden of showing grave risk to the Children in the future. *See Gomez*, 812 F.3d at 1010; *In re S.L.C.*, 4 F. Supp. 3d. 1338, 1350 (M.D. Fla. 2014).

The Mother now testifies the Father repeatedly threatened her life. (Doc. 35, pp. 110:20–111:4, 116:8–17.) But this testimony fails to establish a risk of harm by clear and

convincing evidence. *See Cunningham v. Cunningham*, 237 F. Supp. 3d 1246, 1279–80 (M.D. Fla. 2017); *see also Gomez*, 812 F.3d at 1010. She produces no evidence other than her own self-serving testimony, and could not explain how the Father could make phone calls from prison despite not having access to a telephone. (*See* Doc. 35, p. 116:11–17; Doc. 39, p. 53:1–7.) And her testimony is undercut by her demonstrated willingness to lie under oath when her Children are involved—she deceived the Brazilian courts when she assured them, repeatedly, she was only taking the Children for a short vacation to the U.S., and here she claimed she chose the dates for the "vacation" trip to overlap with the Brazilian Carnival Holiday (so the Children would not miss school) and that the Grandmother could have contacted her by email, if she had wished—neither of which is credible.[11] (Doc. 39, pp. 31:17–22, 36:2–22; *cf.* Docs. 42-6, 42-7, 42-16 to 42-18, 42-24, 42-25.)

Nor does the testimony of Marcel Honda change the calculus. Mr. Honda testified he was a chief of police in Sao Paulo, Brazil. (Doc. 39, p. 41:13–16.) He said the Mother came to him in January 2019, claiming she was feeling unsafe. (*Id.* at 42:6–8, 42:23–43:2.) But his testimony does not help the Mother for two reasons. First, Mr. Honda admitted he did no independent investigation and was merely repeating what the Mother told him. (*Id.* at 52:11–14, 52:23–25.) Second, he is not a credible witness. The police report he prepared to support the Mother's testimony was signed in March 2019—more than two

---

[11] The Children traveled to Orlando on February 12, 2019. (Doc. 39, p. 31:11–13; *see also* Doc. 42-17.) But the Brazilian Carnival holiday did not start until March 1, 2019. *See All About the Rio Carnival 2019*, RioDeJaneiro.Com, available at https://www.riodejaneiro.com/blog/2019/01/09/all-about-rio-carnival-2019/.

months after she allegedly came to him in Brazil, and after she had left the country and violated the Brazilian court's order to return. (*See* Doc. 39, 51:18–23.) Mr. Honda is in the narcotics division, and it is unclear why the Mother would contact him instead of Brazil's dedicated domestic violence section. (Doc. 39, p. 50:17–24.) And Mr. Honda, who testified he was a current chief of police (a federal delegate) living in Sao Paulo, had recently filed several lawsuits in federal court in New York claiming he was living in Alabama—and alleging he wasn't being permitted to serve as a federal delegate. (Doc. 39, pp. 48:6–17, 49:24–50:2, 50:9–16.)

Finally, the evidence of the Children's psychological distress does not show a "grave" risk.[12] Yes, the Father's incarceration distresses the Children—but that is not unexpected nor is it serious enough to prevent their return to Brazil. (*See* Doc. 37, p. 34:8–16; *see also* Doc. 43-18.) That the parties disagreed on how best to break the news of the Father's incarceration doesn't show a risk of future harm.[13] (*See* Doc. 37, pp. 33:13–35:3.) And the Mother does not explain how keeping the Children in the U.S. and cutting off all contact with their Father and Grandmother will somehow alleviate the Children's

---

[12] If the Mother is claiming the Children are facing a grave risk from return to Brazil as a country, relying on general and unsupported assertions a country is dangerous does not meet the standard for showing a grave risk of harm. (Doc. 40, ¶ 65); *see De La Riva*, 183 F. Supp. 3d. at 1199 (M.D. Fla. 2016).

[13] The Mother claims the Grandmother lied to the Children about the Father being incarcerated, causing distress. (Doc. 37, p. 32:1–20.) The Grandmother denies this, and denies the Mother ever accused her of doing so. (Doc. 35, p. 99:9–15.) Even crediting the Mother's version, however, this disagreement fails to support a finding of "grave risk" of harm should the Children be returned as the Children are now aware the Father is incarcerated.

distress at having an incarcerated father. So the Mother has not met her burden to show, by clear and convincing evidence, the Children face a grave risk of harm if returned to Brazil. *See Cunningham*, 237 F. Supp. 3d at 1279–80.

### 3. Other Exceptions

The Mother presents little evidence of the other exceptions, but she raises a number in her final brief. (*See* Doc. 40, ¶ 4.) So the Court addresses each.

First, the Mother claims the Court should refuse return because doing so would go against fundamental principles of human rights and fundamental freedoms since she is a fit parent and parenting rights are fundamental rights under the U.S. Constitution. (Doc. 40, ¶¶ 69–71); Convention, art. 20. But the Court is *not* adjudicating custody rights—it is determining whether custody rights should be decided in Brazil. *See Gomez*, 812 F.3d at 1011. And this argument falls well short of Article 20's exacting standard, which only applies "on the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process." *Sewald v. Reisinger*, No. 8:08-CV-2313JDW-TBM, 2009 WL 150856, at *3 (M.D. Fla. Jan. 21, 2009), aff'd, 2009 WL 6767881 (11th Cir. Nov. 19, 2009) (citations omitted).

Second, the Mother claims, in passing, the Father acquiesced to the Children's removal to Brazil. (Doc. 40, ¶ 4.) But the evidence shows the opposite—the Father strenuously opposed the Children's removal and has worked diligently since learning they hadn't come back to secure their return. (Doc. 35, pp. 42:1–44:20.) The Father didn't acquiesce. *Roque-Gomez v. Tellez-Martinez*, No. 2:14-cv-398-FtM-29DNF, 2014 WL 7014547,

at *10 (M.D. Fla. Dec. 11, 2014) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1070 (6th Cir. 1996).)

Finally, the Mother argues the Children are of a sufficient age and maturity to render an opinion. (Doc. 40, ¶4); *see also* Convention, art. 13, unnumbered paragraph. That *might* be true—but the Children never rendered an opinion to the Court. And at any rate, the young ages of the Children would have limited the effect of any opinion. *See Roque-Gomez*, 2014 WL 7014547, at *11; *Mendez Lynch*, 220 F. Supp. 2d at 1362. So the Mother did not meet her burden here to establish any affirmative defense.

### C. The Court's Discretion

The Father has established a prima facie case for the return remedy, and the Mother has failed to show any of the Hague Convention's exceptions apply, so return is appropriate. Even if the Mother has shown an exception applied, however, the Court would still order the Children's return.

Under Article 18 of the Hague Convention, the Court may exercise its discretion and order the Children's return, despite the existence of an exception, if doing so is in keeping with the Convention's goals. *Fernandez*, 909 F.3d at 363. The "two primary objectives" of the Convention are to promptly return children wrongfully removed or retained and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting State." *Id.* (cleaned up).

The proper place for this custody dispute is in Brazil. The Mother could have,

under Brazilian law, petitioned the Brazilian courts to terminate the Father's parental rights. (*See* Doc. 37, p. 15:2–10.) Instead, the Mother purposefully deceived the Brazilian court to take the Children out of the country, over the Father's objections. (*See* Docs. 42-16, 42-18, 42-19.) This is precisely the type of harm the Hague Convention was designed to address. *See Fernandez*, 909 F.3d at 365. Allowing the Children to remain in the U.S. would reward the Mother's purposeful deception (and kidnapping), divest the Brazilian courts of authority over a custody dispute in which they had been heavily involved, and deprive the Father of the opportunity to meaningfully oppose the Mother's unilateral, ad hoc custody determination. So the Court would exercise its discretion to order the Children's return even if the Children were well settled or another exception applied.

### IV. CONCLUSION

1. The Verified Petition for Return of Children to Brazil (Doc. 1) is **GRANTED.**

2. By Monday, **October 5, 2020**, the parties are **DIRECTED** to confer **and agree** to a time and method of return of the Children. Upon agreement, the parties shall file a notice with the Court; with that notice, the parties may request the return of the passports and travel documents.

3. If the parties fail to timely agree and notify the Court, the Court will order Respondent Dayane Viera to surrender the custody of the minor children, D.V.B.S., Y.V.B.S., and A.V.B.S., to the United States Marshalls Service for return to Brazil.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on September 23, 2020.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record